STATE OF NORTH CAROLINA v. MICHAEL SALVADOR LYNCH, ALIAS MICHAEL SALVADOR WILSON

No. 17

(Filed 15 July 1980)

1. **Criminal Law § 166— incorporating material from another case in brief—necessity for filing material with present case**

When incorporating material from another case by reference in a brief, a copy of the incorporated material should be filed with the immediate case under reivew so that the Court and the opposing party will have access to this material without having to retrieve it from the clerk's file on the other case.

2. **Indictment and Warrant § 15— motion to quash indictment—timeliness**

Defendant's motion to quash the indictments on the ground of racial discrimination in the selection of the grand jury was not timely where it was not made at or before arraignment but was made after a mistrial was declared in defendant's first trial. G.S. 15A-952(e).

3. **Grand Jury § 3.3— racial discrimination in grand jury selection—no prima facie showing**

Evidence that 10.8% to 11.3% of the population of the county was black and that 7.4% of the names on the jury list were of blacks, resulting in a

State v. Lynch

disparity of no more than 3.9%, was insufficient to make out a *prima facie* case of racial discrimination in the selection of the grand jury.

4. **Criminal Law § 86.5— impeaching defendant's character—remarks by defendant to prosecutor during trial**

The district attorney could properly ask defendant on cross-examination if, during the trial as he passed by the district attorney's table, he had called the district attorney a "punk" and had mouthed the word "mother" to him, since any prior act which tended to impeach defendant's character could be asked about as a prior act of misconduct, and the questions were asked in good faith because the district attorney had personal knowledge of the instances of misconduct.

5. **Criminal Law § 86.3— cross-examination of defendant—violation of criminal law—prior conviction or specific act of misconduct**

When misconduct is in violation of the criminal law and has resulted in a conviction, the questioning on cross-examination may be phrased either in terms of a prior conviction or of a prior specific act of misconduct.

6. **Criminal Law § 86.5— cross-examination of defendant—prior acts of misconduct—good faith by prosecutor**

The defendant in a kidnapping and rape prosecution could properly be asked on cross-examination if he had previously broken into a trailer to rape the woman who lived there and if he had broken into the trailer of another woman on another date and raped her where the district attorney asked the questions in good faith in that, in asking the first question, the district attorney relied on a police report stating that officers found defendant lying on the trailer floor "shot with a hood on his head and a gun on his body" and that the woman had lived alone in the trailer next to defendant's house for two months, and, in asking the second question, the district attorney relied on information that the rape victim had identified defendant in a lineup and by photograph.

7. **Criminal Law § 33.3— having woman stand for identification—no evidence as to collateral matter**

The district attorney's action in having a woman stand to determine whether defendant could recognize her after defendant was asked if he had raped the woman on the front row with a black blouse and defendant stated while she was seated that he did not recognize her did not constitute the improper introduction of extrinsic evidence on a collateral matter. Furthermore, defendant was not prejudiced if the woman "gave a nod with her head" when she stood where there was no evidence that the jury observed this alleged occurrence and there was no objection at the point when she was asked to stand.

8. **Jury § 7.14— peremptory challenges—use to exclude blacks from jury**

The district attorney's use of his peremptory challenges to exclude blacks from the jury in his case was not improper.

9. **Jury §§ 7.6, 7.9— State's reopening of questioning of juror after passing him—excusal for cause**

The trial court did not err in permitting the State to reopen its questioning of a juror after the State had passed him, and the court properly excused the juror for cause when he stated that he would be a little biased against the State because the district attorney peremptorily challenged all black jurors.

10. **Jury § 7.9— more value on officer's testimony—denial of challenge for cause**

The trial court did not err in denying defendant's motion to excuse for cause a juror who stated that he would put more value on the testimony of a law officer than on the testimony of other witnesses where the juror then stated that he could be fair to both sides and would base his verdict on the evidence presented and the law as given by the trial judge.

11. **Criminal Law § 87.1— leading questions—no abuse of discretion**

The trial court did not abuse its discretion in permitting the State to ask its chief witness four questions which were somewhat leading where, in each instance, the district attorney was directing the witness's attention to the next subject of inquiry, and the witness elaborated upon his "yes" answer with additional testimony in response to two of the questions.

12. **Criminal Law § 33— defendant's possession of gun on other occasions—relevancy**

Testimony in a kidnapping and rape trial that the State's witness had seen defendant with a gun on days previous to the alleged offenses was relevant to an understanding of the conduct of the witness and defendant since the witness had just testified that when his gun was jammed the defendant said, "Use mine" although defendant did not ultimately produce a gun.

13. **Criminal Law § 88.1— cross-examination—no improper restriction**

Defendant's right to cross-examine the State's chief witness was not improperly restricted when the court sustained the State's objections to repetitious and argumentative questions.

14. **Criminal Law § 87.4— mistrials for failure of jury to agree—no rehabilitation of witness**

Where the State referred to two federal trials of defendant in impeaching him on cross-examination, the trial court's refusal to permit defendant to testify on redirect that mistrials had been declared in those trials because of the jury's inability to agree upon a verdict did not constitute the erroneous refusal to permit defendant to rehabilitate his credibility, since the jury's failure to agree did not amount to an acquittal or invoke the doctrine of double jeopardy, and the testimony thus would not serve to rehabilitate the witness.

15. **Criminal Law § 102.6— prosecutor's jury argument—no impropriety**

In this prosecution for kidnapping and rape, the district attorney properly argued the evidence and the reasonable inferences deductible therefrom in arguing that the State would have no case against an accomplice who testified for the State without his confession, in arguing defendant's prior act of misconduct in raping another woman, in arguing that the State learned of a witness

from the accomplice when the accomplice had not directly so testified, and in arguing that the testifying accomplice would not want to be in the same prison with defendant.

**16. Constitutional Law §§ 28, 50— delay of trial—no prosecutorial oppression**

There was no prosecutorial oppression amounting to a denial of due process in this prosecution for kidnapping and rape where defendant was indicted in November 1977 at a time when he was in federal custody; he was tried twice in federal court for kidnapping, and both trials resulted in mistrials because of hung juries; defendant was delivered into the State's custody on 17 February 1978; the State was granted a continuance from the scheduled trial date of 17 April 1978; the State attempted to prosecute defendant on other charges, but those charges were dismissed for violation of defendant's right to a speedy trial; this case was tried in July 1978 but the jury was unable to reach a verdict and a mistrial was declared; defendant was granted a change of venue to another county on 13 September 1978; the State then relinquished custody of defendant to South Carolina; the South Carolina charges were dismissed on 23 March 1979 and defendant was returned to North Carolina; defendant's motions to dismiss the charges against him in this State for lack of a speedy trial and for prosecutorial oppression were entered on 23 April 1979; and defendant was tried and convicted in July 1979.

**17. Constitutional Law § 50— no denial of right to speedy trial**

Defendant was not denied his right to a speedy trial by the delay between his indictment in November 1977 and his trial in July 1979 where he was either in federal custody or in custody in South Carolina except from February to September 1978 and March to July 1979, and the remaining time falls short of denying defendant his constitutional right to a speedy trial because there is no evidence that any of the delay for which the State of North Carolina was responsible prejudiced his case or his ability to present his defense.

Justice BROCK did not participate in the consideration or decision of this case.

APPEAL by defendant from *Snepp, J.* at the 9 July 1979 Session of MECKLENBURG County Superior Court.

Defendant was charged in indictments, proper in form, with the kidnapping of Edward E. McGinnis and the kidnapping and rape of Cecilia Ann Smith.

The evidence for the State tended to show that on 11 October 1977 defendant and Larry Benton went to Rankin Lake, drank some beer, "smoked some pot," and discussed the idea of committing an armed robbery. Defendant asked Benton if he knew of a place that they could rob and Benton replied that M & M's Grocery on Mauney Road would be a good place to rob. They

left the lake and rode around "just . . . killing time." They picked up a friend, Butch Nichols, "and the conversation came up about getting some pot." When they were unable to buy any marijuana from a friend, they visited an ABC store and purchased a fifth of gin. They went to the defendant's house where they spent an hour and a half drinking the gin they had purchased and shooting about ten games of pool. Then they got into the defendant's car, a 1971 Dodge Charger, and drove to Dallas, North Carolina to pick up a friend of Nichols and then to Gastonia where Nichols and his friend got out of the car.

At this point, defendant and Benton resumed their planning to commit a robbery. They drove to Stanley and on the way stopped at a Family Dollar Store where Benton purchased a ski mask. Benton had a pistol in his possession which he intended to use in the robbery. When checking it, he discovered that it "had jammed up." They pulled over to the side of the road and Benton "got the pistol unjammed and fired two rounds into the ground." Defendant stated, "We ought not to use that gun. Use mine." However, defendant did not produce a gun and Benton insisted on using his own pistol. They rode by the store they intended to rob several times but there were so many cars and people there they decided not to try to rob the store. Defendant then stated, "If we can't get some money, then we'll get . . . [a woman]."

They drove to Stanley and noticed that there were two or three cars parked at Stanley Junior High School. Benton looked in the window to see how many people were there and reported to the defendant that there were three males and three females in the building. Defendant told Benton to let the air out of one of the tires on one of the cars and Benton did so.

This car belonged to Cecilia Ann Smith who was eighteen years old and lived with her parents, Rev. and Mrs. Cecil Smith, in Stanley. That evening she attended a youth revival at the junior high school. Her boyfriend, Edward E. McGinnis, was one of the speakers at the revival. As Miss Smith was leaving the building she discovered she had a flat tire and reported this to McGinnis who prepared to change the tire. Miss Smith then went back in the building to call her parents to tell them that she would be late getting home.

Benton then walked up to McGinnis, held a gun to his head, took his wallet and waited for Miss Smith to return. When she returned, Benton took the keys to her car and locked McGinnis in the trunk. He then took Miss Smith over to the defendant's car and they drove off. Benton raped Miss Smith in the back seat of the car after they had passed through Ranlo (Gaston County) and were travelling down Union Road in the area of Ashbrook High School. Defendant raped Miss Smith in the parking lot of a church in South Carolina, after forcing her to perform oral sex on him first.

A witness for the State testified that in July, 1978 he had a conversation with the defendant and stated to him "that I knowed he did it, but . . . I hope you get out of it." Defendant replied, "[y]eah, but they'll catch hell proving it."

Defendant's evidence tended to show that pubic hair and head hair similar in characteristics to pubic and head hair samples from Miss Smith were found in the back seat of defendant's car. Green and brown beggar's lice — "a seedpod from some type of plant" — were found on Miss Smith's dress and in defendant's car and palm prints identified as Benton's were found on McGinnis' car. Also, pubic hair similar in characteristics to pubic hair samples from Benton were found on Miss Smith's dress. However, the samples found on the victim's dress were "dissimilar to the pubic hair of . . . [defendant] and in all probability could not have come from his pubic area." Defendant's fingerprints were found on items in his own car but none of the fingerprints lifted from the car itself matched defendant's, Benton's or Miss Smith's fingerprints. Soil samples taken from the church yard in South Carolina and from the area around Stanley Junior High School did not match soil samples taken from a pair of defendant's trousers found in his house or a pair found in the trunk of his car. Miss Smith gave only a general description of her assailants and could not make a positive identification.

Defendant testified that on 11 October 1977 he took his children to his mother-in-law's house between 8:30 and 9:00 a.m. and then went to Benton's home. The two ran errands and Benton borrowed a pistol from a friend. They then went to Rankin Lake Park, drank some beers, and "messed around" for a while. In the afternoon, they drank a fifth of gin and shot pool at the defend-

ant's house. At 7:00 p.m. Benton asked to borrow defendant's car. Defendant then took Benton home, went to his mother-in-law's house and picked up his children, and then went back to Benton's house to pick him up. According to the defendant, Benton left defendant's house in defendant's car at 8:30 p.m. and returned at 2:00 a.m. He awakened defendant and asked him to take him home because he had not been home all evening and "he figured his wife was mad at him." Defendant awakened his children, put them in the car and took Benton home.

On the morning of 18 October 1977 police officers awakened defendant and when he opened the door, "they run in and knocked . . . [him] in the floor" and took him into custody. The prosecutrix did not mention seeing the defendant wearing leg braces and he testified that he always wore them when he left the house because he is partially paralyzed from the waist down. At another point in his testimony defendant said he sometimes went outside with a cane only. Defendant receives total disability insurance from the Social Security Administration of approximately $750.00 per month.

Defendant was found guilty of second degree rape and was sentenced to life imprisonment. He was found guilty as charged of kidnapping Miss Smith and the trial judge stated in the judgment that the victim had been sexually assaulted before being released; therefore, he imposed a consecutive life sentence for this conviction. Defendant was also found guilty of kidnapping McGinnis and the trial judge stated in the judgment that the victim was released in a safe place and had not been sexually assaulted; therefore, a sentence of twenty-five years was imposed to run concurrently with the sentences imposed for the other kidnapping conviction.

Defendant's motion to bypass the Court of Appeals on his appeal of the case involving the twenty-five year sentence was allowed by this Court on 19 February 1980. Defendant appealed his other two convictions directly to this Court.

Other facts necessary to the decision of this case will be related in the opinion.

*James E. Ferguson II and C. Yvonne Mims for the defendant.*

*Attorney General Rufus L. Edmisten by Assistant Attorney General Daniel F. McLawhorn for the State.*

COPELAND, Justice.

[1]   At the outset, we note that it was unnecessary for defense counsel to include in the record on appeal their closing arguments before the jury which consume 68 pages of the second addendum to the record. Defense counsel sought to incorporate in their first argument in their brief an argument presented to this Court by another member of their firm in another case in which the same issue was raised. When incorporating material by reference at one point in a brief, a copy of the incorporated material should be filed with the immediate case under review so that the Court and the opposing party will have access to this material without having to retrieve it from the clerk's file on another case. (For example, when an argument presented in a brief filed in the Court of Appeals is incorporated into the argument section of the new brief filed with this Court, the Court of Appeals' brief is filed in the case with our Court. *See,* Rule 28(d), Rules of Appellate Procedure.) Finally, defense counsel failed to follow Rule 28(d)(3) of the Rules of Appellate Procedure which requires that immediately following each question presented in the brief there shall be a reference to the assignments of error pertinent to that question. These problems with the record and defendant's brief have complicated our review in this case. More care should be exercised in presenting a client's case on appeal. *See, State v. Detter,* 298 N.C. 604, 260 S.E. 2d 567 (1979).

Due to the seriousness of the convictions and sentences in this case we have examined the entire record for errors and have considered the questions presented in defendant's brief despite defense counsel's failure to reference the assignments of error in the brief. For the reasons which follow, we find that defendant had a fair trial free from prejudicial error.

Defendant argues in his brief that it was error to deny his motion to quash the petit jury venire in Mecklenburg County since the selection procedure there is racially discriminatory.

Defendant was arraigned and tried on the same charges involved in this case on 17 July 1978 in Gaston County Superior Court. A mistrial was declared on 27 July 1978 when the jury was unable to reach a verdict. The State announced its intention to retry the defendant. On 28 August 1978 defendant, for the first time, moved to quash the indictments which were returned by a

Gaston County Grand Jury in November 1977 and to quash the petit jury venire on the grounds of a racially discriminatory selection procedure. On this same date, defendant also moved for a change of venue to Mecklenburg County on the ground of adverse pretrial publicity and the motion was granted on 13 September 1978. When the case came on for trial on 9 July 1979, defendant made an oral motion to substitute Mecklenburg County in place of Gaston County in the motion he had filed earlier to quash the petit jury venire in the latter county. The trial judge treated this as a motion made pursuant to G.S. 15A-1211(c)(1). Such a motion must be made and decided before any juror is examined. G.S. 15A-1211(c)(4).

Defense counsel stated that his evidence on this motion was the same evidence that another member of his law firm had presented in the case of *State v. Avery* tried by Judge Snepp in December, 1978. Judge Snepp incorporated his ruling on the identical motion in that case into his ruling on the motion in this case. At the time of trial *State v. Avery* was on appeal to this Court and our decision, reported in 299 N.C. 126, 261 S.E. 2d 803 (1980), was announced on 1 February 1980 almost two months before defendant filed his brief in the case *sub judice*. Our decision on this motion is identical to our decision in *Avery* as set forth in a thorough and well reasoned analysis by Justice Brock of the relevant decisional law and constitutional principles.

Defendant also argues that it was error to deny his motion to quash the indictments returned in Gaston County on the ground that the selection procedure for grand jury duty in that county is racially discriminatory.

[2, 3] G.S. 15A-955(1) allows the trial judge on defendant's motion to dismiss an indictment when there is ground for a challenge to the array. This motion must be made at or before the time of arraignment, G.S. 15A-952(b)(4) and G.S. 15A-952(c), or it is waived. G.S. 15A-952(e). *State v. Duncan*, 30 N.C. App. 112, 226 S.E. 2d 182, *cert. denied*, 290 N.C. 779, 229 S.E. 2d 34 (1976). Defendant was arraigned on 17 July 1978 and this motion was made on 28 August 1978 after the first mistrial in state court; therefore, the motion was not timely made. Furthermore, the trial judge was also correct in overruling the motion based on defendant's evidence. The evidence is that 10.8% to 11.3% of the popula-

State v. Lynch

tion of Gaston County is black and that 7.4% of the names on the jury list when indictments were returned were black. This disparity of no more than 3.9% is insufficient to make out a case under the Sixth or Fourteenth Amendment. *State v. Hough*, 299 N.C. 245, 262 S.E. 2d 268 (1980). The evidence is that the jury list was prepared in conformity with G.S. 9-2 *et seq.* which we held to be constitutional in *State v. Cornell*, 281 N.C. 20, 187 S.E. 2d 768 (1972).

[6] Defendant maintains that it was error to allow the district attorney to ask him on cross-examination if he had broken into Danny Ledford's trailer on 12 December 1974 in order to rape the woman who lived there; if he had broken into the trailer of Leigh Mangum Smith on 18 September 1973 and raped her; and if, during the trial as he passed by the district attorney's table, he had called the district attorney a "punk" and had mouthed the word "mother" to him.

A defendant who takes the witness stand can be cross-examined for impeachment purposes about prior convictions. *State v. Herbin*, 298 N.C. 441, 259 S.E. 2d 263 (1979); *State v. Monk*, 286 N.C. 509, 212 S.E. 2d 125 (1975); *State v. Wright*, 282 N.C. 364, 192 S.E. 2d 818 (1972); *State v. Miller*, 281 N.C. 70, 187 S.E. 2d 729 (1972). A defendant may also be cross-examined for impeachment purposes about prior specific acts of misconduct so long as the questions are asked in good faith. *State v. Herbin*, *supra; State v. Mack*, 282 N.C. 334, 193 S.E. 2d 71 (1972). The district attorney may not ask about or refer in his questions to prior arrests, indictments, charges, or accusations. *State v. Herbin*, *supra; State v. Williams*, 279 N.C. 663, 185 S.E. 2d 174 (1971).

[4] Prior specific acts of misconduct do not have to be violations of the criminal law. Any prior act which tends to impeach defendant's character may be asked about as an act of misconduct. *State v. Mack*, *supra;* 1 Stansbury's N.C. Evid. § 111, notes 9, 11 and 12 (Brandis Rev. 1973 and Cum. Supp. 1979) and the numerous cases cited therein. Therefore, it was proper for the district attorney to question defendant on cross-examination about words defendant had spoken to the district attorney when passing by his table. Those questions were asked in good faith because the district attorney had personal knowledge of those alleged instances of misconduct.

If the misconduct does constitute a violation of the criminal law, the questioning concerning prior specific acts of misconduct does not have to be restricted to prior acts that have resulted in a criminal conviction. *State v. McKenna*, 289 N.C. 668, 224 S.E. 2d 537, *death sentence vacated*, 429 U.S. 912 (1976). If such were the case, there would be no category of impeachment material relating to prior specific acts of misconduct. The category would be wholly subsumed within the category of prior convictions.

[5] When the misconduct is a violation of the criminal law and has resulted in a conviction, the questioning on cross-examination may be phrased in terms of a prior conviction or still in terms of a prior specific act of misconduct. We held in *State v. Mack, supra* that a question may be phrased in terms of a prior specific act of misconduct even though there has been a conviction. Of course, the reverse is not true. The questioning cannot be phrased in terms of a prior conviction when there is misconduct but there has been no conviction. This apparently was the error in the case cited by the defendant, *Foster v. Barbour*, 613 F. 2d 59 (4th Cir. 1980), and for this reason the case is wholly unpersuasive in the determination of the issue at hand. We are dealing with the category listed above of prior specific acts of misconduct which are violations of the criminal law but for which there have been no convictions. The defendant was asked if he had in fact committed two previous acts of rape and not what he had been convicted of. The issue is whether the district attorney had reason to believe that defendant had in fact committed two previous rapes so the questions asked in terms of prior specific acts of misconduct were asked in good faith.

Defendant cites *Watkins v. Foster*, 570 F. 2d 501 (4th Cir. 1978), in an effort to persuade this Court that the district attorney did not act in good faith because he did not have a factual basis to believe that defendant had committed those two prior acts of misconduct. In *Watkins* the defendant was asked about six prior instances of breaking and entering in an effort to impeach his trial testimony. Defendant had been indicted for those six offenses; however, the court held that the indictments were insufficient to supply the prosecutor with good faith because at the time of trial one of those six indictments had already been dismissed and after trial the remaining five were dismissed for insufficient evidence.

[6]   The situation in this case is entirely different. In asking about the rape of Ledford's wife on 28 December 1974, the district attorney relied on a police report which stated that police officers found the defendant "in the floor shot with a hood on his head and a gun on his body." The woman had lived alone in the trailer next to defendant's house for two months. On the night defendant was shot the woman's husband was in the trailer when defendant entered.

With respect to asking about the rape of Leigh Mangum Smith on 18 September 1973, the district attorney took the stand and testified on a *voir dire* hearing regarding the question of good faith. He testified that the rape occurred in a trailer park next to defendant's house. Defendant was picked up at the time as a suspect and was placed in a lineup. The victim identified the defendant and another member of the lineup. She told the district attorney that when she went to the lineup in 1973 the police had told her that she would be able to look at the suspects through a two-way mirror. However, they took her into a small room where she directly confronted the suspects. She told the district attorney that she had no doubt about who had raped her but she would not identify only the defendant because a few hours before the lineup he had threatened to kill her. The district attorney showed her a display of eight photographs of black males and made no suggestions to her. She immediately picked out the defendant's picture. On the facts of this case, we hold that questions about both rapes were asked in good faith. The questions were asked for impeachment purposes and involved a collateral matter. Thus, the district attorney was bound by the defendant's answer which in both instances was a denial. *State v. Gaiten*, 277 N.C. 236, 176 S.E. 2d 778 (1970).

[7]   Defendant maintains that by having Leigh Mangum Smith stand while the defendant was asked if he had raped the woman on the front row with the black blouse amounted to improperly introducing extrinsic evidence on a collateral matter. We hold that on the facts of this case it was not error for her to stand up because she was asked to stand only after defendant stated that he didn't know anyone on that row "but the Ledfords." When she stood, defendant stated, "I think I've seen her, but I didn't break in her trailer and rape her."

At a much later point in the record defense counsel stated that when the lady stood up she "gave a nod with her head." The trial judge stated that he did not observe her nod her head and it was not called to his attention at the time it allegedly occurred. This Court held in *State v. Carey,* 288 N.C. 254, 218 S.E. 2d 387 (1975), *death sentence vacated,* 428 U.S. 904 (1976), that the defendant must adequately place in the record what the expression was and how it was prejudicial to him before there is an issue for this Court to decide. There is no evidence that the jury observed this alleged occurrence and there was no objection at the point when she was asked to stand. We find no prejudicial error. This case is distinguishable from *State v. Broom,* 222 N.C. 324, 22 S.E. 2d 926 (1942), in which it was held to be error to allow abortion instruments to be introduced into evidence after defendant had been asked on cross-examination for impeachment purposes if he had performed certain abortions. This was impermissible introduction of extrinsic evidence on a collateral matter. Here, the lady was asked to stand to determine whether defendant could recognize her after he had stated while she was seated that he did not recognize her. This was not introduction of extrinsic evidence or the equivalent of it.

[8] Defendant's next argument relates to the selection of the jury in this case. He first argues that the district attorney improperly used his peremptory challenges to exclude blacks from the jury. He challenges the exclusion of blacks solely in this case and not in relation to any allegation of a long-term systematic practice by the State of excluding Blacks from service on petit juries in Mecklenburg County.

His argument is wholly devoid of merit and the answer to his argument was provided fifteen years ago by the United States Supreme Court in *Swain v. Alabama,* 380 U.S. 202, 13 L.Ed. 2d 759, 85 S.Ct. 824, *rehearing denied,* 381 U.S. 921 (1965). That court held:

> "The function of the challenge is not only to eliminate extremes of partiality on both sides, but to assure the parties that the jurors before whom they try the case will decide on the basis of the evidence placed before them, and not otherwise. . . .

State v. Lynch

The essential nature of the peremptory challenge is that it is one exercised without a reason stated, without inquiry and without being subject to the court's control. . . . [V]eniremen are not always judged solely as individuals for the purpose of exercising peremptory challenges. Rather they are challenged in the light of the limited knowledge counsel has of them, which may include their group affiliations [race, religion, nationality, occupation, etc.] in the context of the case to be tried.

With these considerations in mind, we cannot hold that the striking of Negroes in a particular case is a denial of equal protection of the laws. In the quest for an impartial and qualified jury, Negro and white, Protestant and Catholic, are alike subject to being challenged without cause. To subject the prosecutor's challenge in any particular case to the demands and traditional standards of the Equal Protection Clause would entail a radical change in the nature and operation of the challenge. The challenge, *pro tanto*, would no longer be peremptory, each and every challenge being open to examination, either at the time of the challenge or at a hearing afterward. The prosecutor's judgment underlying each challenge would be subject to scrutiny for reasonableness and sincerity. And a great many uses of the challenge would be banned.

In the light of the purpose of the peremptory system and the function it serves in a pluralistic society in connection with the institution of jury trial, we cannot hold that the Constitution requires an examination of the prosecutor's reasons for the exercise of his challenges in any given case. The presumption in any particular case must be that the prosecutor is using the State's challenges to obtain a fair and impartial jury to try the case before the court. The presumption is not overcome and the prosecutor therefore subjected to examination by allegations that in the case at hand all Negroes were removed from the jury or that they were removed because they were Negroes. Any other result, we think, would establish a rule wholly at odds with the peremptory challenge system as we know it. Hence the motion to strike the trial the trial jury was properly denied in this

case." *Id.* at 219-222, 13 L.Ed. 2d at 772-774, 85 S.Ct. at 835-837. [Citations omitted.]

[9]  Defendant asserts that it was error to allow the State to reopen its questioning of juror Shipley after the State had passed him and that it was error for the trial judge to subsequently excuse the juror for cause. It was not error to allow the State to reopen its questioning of this juror. *State v. McKenna, supra.* The juror stated that he questioned why the district attorney had peremptorily challenged all black jurors and further stated, "I say in all honesty, I would be a little prejudiced against the State for that question." When the trial judge asked the juror if he felt any bias against the State he replied, "I would say to a very small degree, yes." The juror was properly excused for cause.

[10]  Defendant further asserts that it was error to deny his motion to excuse juror Henderson for cause after he stated that he would put more value on the testimony of a law enforcement officer than on the testimony of other witnesses. The juror then stated that he would be fair to both sides and would base his verdict on the evidence as presented and the law as given by the trial judge. His final statement regarding the weight he would give a police officer's testimony was that he would "support a police officer in whatever testimony . . . [he] gave on the stand . . . [i]f I thought he was right. I got a police ticket one time that I didn't think was right, so I took it to Court. But I've gotten others that . . . were right." The motion to excuse the juror for cause was properly denied. Challenges for cause are directed to the sound discretion of the trial judge and are reviewable only for abuse of discretion or "some imputed error of law." *State v. Tatum,* 291 N.C. 73, 229 S.E. 2d 562 (1976). There is no error of law or abuse of discretion here.

[11]  Defendant argues in his brief that his objections to four leading questions asked by the State of its principal witness, Larry Benton, were improperly overruled. The substance of each question was as follows:

  1. "Did you have any conversation with each other whether or not you all would be armed during the robbery and who would do what at the time of the robbery?"

  2. "On days previous to this had you ever seen him with a weapon?"

State v. Lynch

3. "Had you and the defendant had any conversation about what you would do with any female that you took into your custody?"

4. "Did you say anything to him about where to go or to pull off?"

While the questions may have been somewhat leading, this is a matter within the trial judge's discretion, *State v. Greene*, 285 N.C. 482, 206 S.E. 2d 229 (1974), and there was no abuse of that discretion. In each instance, the district attorney was directing the witness' attention to the next subject of inquiry and in response to two of the questions the witness elaborated upon his "yes" answer with additional detailed testimony. There was no prejudicial error.

Defendant alleges that testimony regarding other criminal activity of the defendant was improperly admitted when Benton testified at one point that the conversation came up "about getting some pot" and "they went looking for some pot." The error, if any, in admitting this testimony over defendant's objection was not prejudicial error because substantially similar testimony came in from the same witness without objection and also from the defendant himself. Benton had already testified that he and the defendant had smoked some marijuana at Rankin Lake before the conversation came up about getting some more marijuana. Also, defendant testified that he remembered an occurrence "on October 3rd because it was my birthday and we was hunting marijuana at the time." Therefore, defendant lost the benefit of his objection to this testimony. *State v. Owens*, 277 N.C. 697, 178 S.E. 2d 442 (1971).

Defendant further argues that testimony regarding the most direct route from defendant's house to Kiser Elementary School in Stanley and the time it takes to travel that route was improperly admitted because the testimony was irrelevant. The testimony that it takes twenty-nine minutes and thirty seconds to travel the most direct route between those two points was properly admitted to cast doubt on defendant's testimony that Benton left defendant's house with his car at 8:30 p.m. when there was other testimony that Benton arrived at the school shortly before a ball game ended which ended before 9:00 p.m.

[12]  Defendant also alleges that irrelevant and prejudicial testimony was admitted over his objection when Benton was allowed to testify that he had seen the defendant with a gun on days previous to the alleged offense. Evidence is relevant and admissible if it has any logical tendency to prove a fact in issue; if it throws any light upon the supposed crime; and if it is one of the circumstances surrounding the parties necessary to be known to properly understand their conduct or motives or allows the jury to draw an inference as to a disputed fact. *State v. Arnold*, 284 N.C. 41, 199 S.E. 2d 423 (1973). This testimony was relevant to an understanding of the conduct of Benton and the defendant because Benton had just stated in response to a previous question that when his gun was jammed the defendant said "[u]se mine" although defendant did not ultimately produce a gun.

[13]  Defendant contends that his right to cross-examine Benton was improperly restricted. This contention is devoid of merit. Benton answered a question from defense counsel as follows:

> "I was asked under oath whether I was testifying falsely in federal court when I said that she hadn't scratched me. Even though I had given a directly opposed answer to what I had given before, I said I was not testifying falsely under oath in federal court."

Defense counsel then asked if Benton's answer "would be today that you weren't testifying falsely in federal court. . .?" This question was a complete repetition of the preceding question and it was not error to sustain the State's objection. *State v. Maynard*, 247 N.C. 462, 101 S.E. 2d 340 (1958).

In the second episode, Benton had stated that he had seen the defendant walking outside his home with a cane and that "a cane could be a brace." Then, defense counsel sought essentially the same answer again by asking: "You are not trying to tell this jury now that you call a cane a brace are you?" It was not error to sustain the State's objection to this repetitious and argumentative question. *Id.* Defendant himself testified that he had been outside his home "with just a simple wooden cane" without the use of his braces.

[14]  Defendant maintains that it was error to refuse to allow him to rehabilitate his credibility on redirect examination by

testifying as to the disposition of the federal charge he had faced growing out of the same incident. The State had referred to the federal cases in impeaching the defendant on cross-examination. Defendant testified that at the time of the state trial there were no federal charges pending against him. Both of the trials in federal court resulted in a mistrial due to the jury's inability to agree upon a verdict but the defendant was not allowed to so testify. Since the jury's failure to agree does not constitute an acquittal or invoke the doctrine of double jeopardy, such testimony does not serve to rehabilitate the witness. Thus, it was not reversible error to refuse to permit this testimony.

[15] Defendant alleges that it was error to overrule his objections to certain portions of the district attorney's closing argument. Defendant argues that it was inflammatory for the district attorney to remark that without Benton's confession the State would have no case against him; that the district attorney improperly argued defendant's prior act of misconduct in raping Leigh Mangum Smith; that it was not a proper inference from the record that the State learned of a witness from Benton when Benton had not directly so testified; and that Benton would not want to be in the same prison with the defendant.

Argument of counsel is largely within the control and discretion of the trial judge. Counsel must be allowed wide latitude in the argument of hotly contested cases. Counsel for both sides are entitled to argue to the jury the law and the facts in evidence and all reasonable inferences to be drawn therefrom. *State v. King*, 299 N.C. 707, 264 S.E. 2d 40 (1980); *State v. Monk, supra.*

Counsel may not argue to the jury incompetent and prejudicial matters and may not "travel outside the record" by injecting into his argument facts of his own knowledge or other facts not included in the evidence. *State v. Westbrook*, 279 N.C. 18, 181 S.E. 2d 572 (1971), *death sentence vacated*, 408 U.S. 939 (1972). Upon objection, the trial judge has a duty to censor remarks not warranted by either the evidence or the law, or remarks calculated to mislead or prejudice the jury. *State v. Monk, supra* and cases cited therein.

There is no reversible error in this case. The district attorney did not transcend the boundaries of the wide latitude permitted in closing arguments. He argued the evidence and the

reasonable inferences deducible therefrom. He was properly arguing defendant's credibility when he referred to the prior act of misconduct. His remarks were not misleading or prejudicial and do not warrant a new trial.

Finally, defendant argues that the State's conduct in this case violates due process because it offends those canons of decency and fairness which express the notions of justice of English-speaking peoples citing *Rochin v. California*, 342 U.S. 165, 96 L.Ed. 183, 72 S.Ct. 205 (1952).

Defendant was indicted on these charges in November, 1977. At that time he was in federal custody and was tried twice in federal court for kidnapping a person and taking her across a state line. Both trials resulted in a mistrial due to a hung jury. The State has absolutely no responsibility for those proceedings against the defendant or the time it took for those two trials to be conducted. Defendant was delivered into the State's custody on 16 February 1978 and the case was scheduled to be tried on 17 April 1978. The case was not tried on that date because the State was granted a continuance. The State then attempted to prosecute the defendant on other unrelated charges but those charges were dismissed because defendant's right to a speedy trial had been denied.

This case was then tried in July of 1978 in Gaston County. The jury was unable to reach a verdict and a mistrial was declared. Defendant then filed numerous motions on 28 August 1978. Defendant's motion for a change of venue to Mecklenburg County was granted on 13 September 1978. The remaining motions came on for a hearing on 18 September 1978. At that time, the motions were not heard because the State relinquished custody of the defendant to South Carolina authorities. Those authorities dismissed their charges against the defendant on 23 March 1979 and defendant was returned to custody in North Carolina. Defendant moved to dismiss the charges pending against him in this State for lack of a speedy trial and for prosecutorial oppression. These motions were heard on 12 April 1979 and an Order denying them was entered on 23 April 1979. The case was tried and defendant was convicted of all three charges in July 1979.

[16]   There was no prosecutorial oppression in this case amounting to a denial of due process. Defendant committed offenses involving three jurisdictions. Therefore, the process of coordinating the prosecutions in those three jurisdictions necessarily would involve a substantially greater period of time then if only one jurisdiction was involved. Also contributing to the increase of time involved was the fact that there were two mistrials in federal court and one in state court. Double jeopardy did not bar the second prosecution in federal court or the second trial in state court and these new trials necessarily involved the consumption of more time. Defendant did not file any motions to contest his extradition to South Carolina or to avail himself of the procedures and protections afforded him by G.S. 15A-730 relating to arrests upon Governor's warrants and his right to apply for a writ of habeas corpus to test the legality of the arrest.

[17]   In addition, the delay did not violate defendant's right to a speedy trial. The present statutory right to a speedy trial does not apply to cases pending in the trial court on 1 October 1978 and therefore is inapplicable here. G.S. 15A-701 *et seq.*

Defendant was not denied his constitutional right to a speedy trial. He originally made a motion to dismiss for lack of a speedy trial on 9 May 1978 but the motion was apparently not heard and the case was tried in Gaston County in July 1978. The time involved in bringing him to trial in North Carolina, excluding the time that he was in federal custody and in custody in South Carolina, was from February to September 1978 and March to July 1979. Defendant had motions filed and pending in August and September 1978 and in April 1979. The remaining time falls far short of denying defendant his constitutional right to a speedy trial because there is no evidence that any of the delay for which the State of North Carolina was responsible prejudiced his case or his ability to present his defense in any manner whatsoever. *Barker v. Wingo,* 407 U.S. 514, 33 L.Ed. 2d 101, 92 S.Ct. 2182 (1972); *State v. Tindall,* 294 N.C. 689, 242 S.E. 2d 806 (1978); *State v. Watson,* 281 N.C. 221, 188 S.E. 2d 289, *cert. denied,* 409 U.S. 1043 (1972); *cf. State v. McKoy,* 294 N.C. 134, 240 S.E. 2d 383 (1978) (charges ordered dismissed due to denial of defendant's constitutional right to a speedy trial). Therefore, defendant's constitutional rights were not violated by the length of time involved in this case.

There were numerous exceptions that were not brought forward in defendant's brief or that were brought forward but not argued and these are deemed abandoned. Rule 28(a)(b)(3), Rules of Appellate Procedure.

Defendant's convictions are affirmed because in the trial we find

No error.

Justice BROCK did not participate in the consideration or decision of this case.