STATE OF NORTH CAROLINA v. LARRY DARNELL WILLIAMS

No. 175A85

(Filed 12 August 1986)

1. **Criminal Law §§ 102.6, 135.8— jury argument—killing to eliminate potential witness—gross impropriety**

   Comments by the prosecutor during his closing argument insinuating that an armed robbery victim was killed in order to prevent her from identifying defendant as one of the robbers were so grossly improper that the trial court committed reversible error in failing to intervene *ex mero motu* to correct the error where the prosecution presented absolutely no evidence whatsoever which showed that the victim's killing was motivated by a desire to eliminate a potential witness, and the prosecutor was put on notice that there was a lack of such evidence by a decision in a prior appeal of this case that the evidence did not justify the submission of an aggravating factor as to whether the murder was committed for the purpose of avoiding arrest or effecting an escape on the theory that the victim was killed to eliminate her as a witness.

2. **Constitutional Law § 80; Criminal Law § 135.8— robbery-murder—pecuniary gain aggravating circumstance—no cruel and unusual punishment**

   Consideration of pecuniary gain as an aggravating circumstance in a robbery-murder case does not violate the Eighth Amendment proscription against cruel and unusual punishment, since the fact that a killing is committed for pecuniary gain is a circumstance which legitimately serves effectively to differentiate between *all* persons convicted of first degree murder and those few who are deserving of the death penalty.

   Justice BILLINGS concurring in result.

   Justice MITCHELL joins in the concurring opinion.

DEFENDANT appeals from a judgment imposing the death sentence entered by *Freeman, J.,* at the 25 February 1985 Criminal Session of Superior Court, CABARRUS County.

This case came on for resentencing following a decision of this Court reported at 304 N.C. 394, 284 S.E. 2d 437 (1981). At the

first trial, the defendant was convicted of the first-degree murder of Susan Pierce. Ms. Pierce, a clerk at a Seven-Eleven convenience store in Concord, North Carolina, was killed during the course of an armed robbery of the store. Following a sentencing hearing conducted pursuant to N.C.G.S. § 15A-2000, the jury recommended that the defendant be sentenced to death. From the imposition of a sentence of death, the defendant appealed to this Court as a matter of right. Writing for a unanimous Court, Chief Justice Branch found no error in the first-degree murder conviction. However, the Court found error in the sentencing phase of the trial and remanded the case for a new sentencing hearing.

After considering the evidence at the second sentencing hearing, a jury recommended that the defendant be sentenced to death. From the imposition of a sentence of death, the defendant appeals to this Court as a matter of right. N.C.G.S. § 7A-27(a) (1981 and Cum. Supp. 1985). Heard in the Supreme Court 12 May 1986.

*Lacy H. Thornburg, Attorney General, by Joan H. Byers, Special Deputy Attorney General, and Jane P. Gray, Special Deputy Attorney General, for the State.*

*Ann B. Petersen for defendant-appellant.*

MEYER, Justice.

Facts pertinent to the guilt-innocence determination phase of the trial are fully discussed in the opinion reported at 304 N.C. 394, 284 S.E. 2d 437 (hereinafter referred to as *Williams I*). As the issues raised on this appeal relate only to the resentencing, we deem it unnecessary to repeat those facts brought out at the guilt-innocence determination phase of the trial.

The State presented evidence at the resentencing hearing which tended to show that Susan Verle Pierce was employed as a clerk at the Seven-Eleven convenience store located at 807 Church Street in Concord, North Carolina. Ms. Pierce was seen alive by a customer shortly after 6:00 a.m. on 3 June 1979. Upon returning to the store approximately twenty minutes later, the same customer discovered Pierce's bloodstained body lying on the floor. Emergency medical personnel, law enforcement officers, and the store manager subsequently arrived at the scene. An ex-

amination ascertained that Pierce was dead. Police observed that a cabinet safe was open and the cover to a floor safe had been removed. The store manager conducted an inventory and determined that $67.27 was missing from the store. The store manager also testified that when a store employee made a roll of coins, the employee would write his name on the roll.

Dr. John Butts, Associate Chief Medical Examiner for the State of North Carolina, performed an autopsy on the body of Ms. Pierce on 3 June 1979. He testified that, in his opinion, Ms. Pierce died as a result of a shotgun wound to the base of the neck which resulted in the perforation of her carotid arteries. Dr. Butts further testified that Ms. Pierce would have died within a minute or two of the shotgun blast. Dr. Butts also opined that the shotgun muzzle was probably within five to six feet from Ms. Pierce when the shot was fired and that it was certainly within the broader range of from three to nine feet when the shot was fired.

The State also presented evidence tending to show that in the spring of 1979, the defendant lived in an apartment with his girlfriend, Linda Massey; her two children; Linda's sister, Annie Brawley; and Brawley's fourteen-year-old son, Darrell. On 4 June 1979, Darrell Brawley was taken into custody on a charge of operating a motor vehicle without an operator's license. At some point, Brawley informed the police that he had information concerning recent shootings which had occurred in Gaston County and Concord. Subsequently, Brawley made statements to the police implicating the defendant in these shootings, and he agreed to testify against the defendant. Brawley's statements concerned four incidents—one in which the possibility of a robbery was foiled by the presence of police officers, one in which the possibility of a larceny of a firearm was abandoned, and two completed armed robberies with a death resulting from each.

Brawley testified that on the evening of 2 June 1979, the defendant, Linda Massey, and he drove to the Freekie Deekie Club in a neighbor's Oldsmobile Delta 88. At some point, the defendant and Massey took some pills and drank beer. They subsequently left the Freekie Deekie Club and drove to a house on Pitts Drive and picked up a man who was introduced to Brawley as Danny Brown. They then returned to the Freekie Deekie Club, staying approximately ten minutes. As they prepared to leave,

Brawley stated to the defendant, "Let's go make some money in Gastonia or Concord." The defendant proceeded to load a sawed-off .20-gauge, single-shot shotgun, and they drove off.

Brawley stated that he then went to sleep and did not awaken until they pulled into a service station. Massey and he went into the station to look around, and when they returned, Massey told the defendant that "the lick is sweet." However, the defendant noticed approximately five state troopers parked at an abandoned service station across the road and therefore drove off. They soon stopped at a roadside cafe. The defendant saw a truck parked outside the cafe; there was a rifle on a rack in the back window of the truck. The defendant remarked that he wanted the rifle. However, the owner of the truck soon came out and moved the truck in front of the cafe window. The defendant and the others then drove off.

Brawley again dozed off. When he awoke, they were stopped at another service station. The defendant and Brown got out of the car and went into the station. The defendant was carrying the shotgun. Brown knocked the attendant to the floor and proceeded to take money from the cash register while the defendant pointed the shotgun at the attendant. Brawley testified that as Brown was running out of the station, he heard a loud "boom" emanating from the station. The defendant then grabbed the money, ran to the car, and they drove off.[1]

Once again, Brawley fell asleep. He was awakened by a loud "boom" and discovered that they had stopped. He saw Brown and the defendant running out of a store. They drove off as soon as Brown and the defendant got in the car. Brawley asked the defendant if he was going to share with him any of the money that had been taken from the store. The defendant responded that since Brawley had not done any of the "work," he was not going to get any "pay." Brawley identified the Seven-Eleven store where Susan Pierce was shot as the one the group had been to on

1. The testimony concerning the events at the service station related to the murder of Eric Joins, the station attendant. The defendant was also tried for that murder. He was convicted and sentenced to death. This Court affirmed the conviction and death sentence in *State v. Williams*, 305 N.C. 656, 292 S.E. 2d 243, *cert. denied*, 459 U.S. 1056, 74 L.Ed. 2d 622 (1982), *reh'g denied*, 459 U.S. 1189, 74 L.Ed. 2d 1031 (1983).

the morning of 3 June 1979. Brawley also stated that he had entered into a plea agreement with the State under which he was allowed to plead guilty to being an accessory after the fact to murder. He was sentenced to a ten-year term of imprisonment for that offense.

Linda Massey testified that she also entered into a plea agreement whereby she was allowed to plead guilty to being an accessory after the fact to murder and that she received a ten-year sentence. Massey testified to facts which were essentially the same as those testified to by Brawley. Additionally, she was able to give a more detailed recitation of the events which occurred at the Seven-Eleven store where Ms. Pierce was shot. She testified that after they stopped at the Seven-Eleven, the defendant went inside the store carrying the shotgun. The other man went in also. Massey was able to see a heavy-set white lady wearing a red or orange jacket in the store. Massey stated that when the defendant went into the store, she closed her eyes and prayed. Subsequently, she heard a loud noise coming from the store and she opened her eyes. At that time, she saw the lady grab her chest. The defendant and the other man then ran out of the store and got in the car. The group proceeded to drive away. Later that day, the defendant gave Massey some dollar bills and several rolls of quarters. Massey used this money to make a car payment on 4 June 1979. Evidence was introduced showing that these rolls of quarters had the victim's name, "Susan Verle," written on them.

The State also offered the testimony of Robert Kindley, who testified that at approximately 6:10 a.m. on 3 June 1979, he and his wife passed the Seven-Eleven store on Church Street in Concord. Kindley stated that he saw a black male sitting on the passenger seat of an automobile in the store's parking lot. The man appeared to be tying his shoes.

Evidence was also presented tending to show that one of the defendant's fingerprints was found on the inside of the rear passenger window of the Oldsmobile allegedly used by the group at the time in question.

The defendant did not testify at the sentencing hearing. However, a former employer testified that the defendant had been a good worker. Also, a Charlotte attorney testified that he

had represented the defendant in a personal injury action and that he had found him to be likable and cooperative. The parties stipulated that the defendant had an IQ of 69.

Based upon the evidence introduced during the sentencing phase of the trial, the trial court instructed the jury on two possible aggravating circumstances: (1) whether the murder was committed for pecuniary gain, and (2) whether the murder was part of a course of conduct in which the defendant engaged which included the commission of other crimes of violence against other persons. The trial court also instructed the jury on four possible mitigating circumstances: (1) whether the defendant was gainfully employed when the offense occurred, (2) whether the defendant had an intelligence quotient of 69, (3) whether the defendant conducted himself in a normal business manner with his attorney in his personal injury case, and (4) whether the defendant was twenty-four years old at the time of the offense. The jury was also instructed as to the statutory "catchall" mitigating circumstance— N.C.G.S. § 15A-2000(f)(9). The jury found both of the aggravating factors and each of the mitigating factors which were submitted. The jury found as an additional mitigating circumstance that the credibility of the prosecution's two star witnesses was questionable. The jury went on to find that the mitigating circumstances were insufficient to outweigh the aggravating circumstances and that the aggravating circumstances were sufficiently substantial to call for the imposition of the death penalty when considered with the mitigating circumstances found. We do not here address the correctness of the mitigating factors submitted to and found by the jury. The jury returned a recommendation that the defendant be sentenced to death. Following the recommendation, the trial court entered judgment sentencing the defendant to death.

[1] The defendant presents a number of assignments of error. The dispositive assignment of error, however, concerns several statements made by the prosecutor during his closing argument which insinuated that Ms. Pierce was killed in order to prevent her from identifying the defendant as the perpetrator of the robbery. In order to analyze this issue, it is necessary to briefly examine this Court's decision in *Williams I*.

In *Williams I*, this Court found no error in the defendant's conviction for the first-degree murder of Ms. Pierce. However, we

vacated the defendant's death sentence and remanded the case for a new sentencing hearing based upon the improper submission of the aggravating circumstance set out in N.C.G.S. § 15A-2000 (e)(4), that the capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody. This aggravating factor was submitted on the theory that Ms. Pierce was killed in order to eliminate her as a witness who could later identify the perpetrators of the armed robbery. *State v. Williams*, 304 N.C. at 424, 284 S.E. 2d at 455. We concluded that the evidence did not raise a reasonable inference that this was a motivating factor in the killing, and therefore the trial court erred in submitting this aggravating factor. *Id.* at 425, 284 S.E. 2d at 456. We also held that the error was so prejudicial as to require that the defendant be afforded a new sentencing hearing. *Id.* at 426, 284 S.E. 2d at 456-57.

At the second sentencing hearing, the State presented virtually the same evidence which was presented at the trial. In particular, there was no additional evidence introduced at the second sentencing hearing which would support the contention that Ms. Pierce was killed in order to prevent her from being able to identify the perpetrators of the armed robbery of the convenience store. Therefore, the trial court correctly refrained from submitting the aggravating factor set out in N.C.G.S. § 15A-2000(e)(4). However, at several points during his closing argument, the prosecutor contended to the jury that Ms. Pierce was killed in order to prevent her from identifying the armed robbers. At one point, the prosecutor was discussing the fact that Ms. Pierce had apparently given the robbers all of the money which she had access to. The prosecutor then stated:

> What purpose then the killing? The same purpose as killing the helpless Eric Joins as he lay face down on the concrete floor. Dead witnesses don't testify.

Later, when discussing the stipulated evidence that the defendant had an IQ of 69, the prosecutor stated:

> He has sufficient intelligence to know [that] when you leave witnesses they can identify you.

Later, the prosecutor argued:

The only reason he killed her was to get her money. That's a rough aggravating circumstance, no temper, no squabble, no fights, no flash of anger; cold, calculated, premeditated, eliminate the witness.

He did it for her money, for pecuniary gain so that she could not later testify against him when he stole the money she had in her possession.

Still later in his argument, the prosecutor stated:

He took the life of Susan Pierce without passion, without hate, without anger; merely to make sure she couldn't be a witness.

The defendant failed to object to any of these statements, and the trial court did not intervene *ex mero motu.* The defendant now argues that these comments by the prosecutor insinuating that Ms. Pierce's killing was motivated by a desire to eliminate a potential witness against him were grossly improper and require that he be given a new sentencing hearing. We agree.

It is well settled that the arguments of counsel are left largely to the control and discretion of the trial judge and that counsel will be granted wide latitude in the argument of hotly contested cases. *E.g., State v. Riddle,* 311 N.C. 734, 319 S.E. 2d 250 (1984); *State v. Adcock,* 310 N.C. 1, 310 S.E. 2d 587 (1984); *State v. Whisenant,* 308 N.C. 791, 303 S.E. 2d 784 (1983); *State v. Miller,* 288 N.C. 582, 220 S.E. 2d 326 (1975). Counsel is permitted to argue the facts which have been presented, as well as reasonable inferences which can be drawn therefrom. *E.g., State v. Hamlet,* 312 N.C. 162, 321 S.E. 2d 837 (1984); *State v. Murray,* 310 N.C. 541, 313 S.E. 2d 523 (1984); *State v. Wright,* 304 N.C. 349, 283 S.E. 2d 502 (1981). Conversely, counsel is prohibited from arguing facts which are not supported by the evidence. *E.g., State v. Lynch,* 300 N.C. 534, 268 S.E. 2d 161 (1980); *State v. Monk,* 291 N.C. 37, 229 S.E. 2d 163 (1976). These principles apply not only to ordinary jury arguments, but also to arguments made at the close of the sentencing phase in capital cases. *See State v. Johnson,* 298 N.C. 355, 259 S.E. 2d 752 (1979).

As noted earlier, the defendant failed to object to any of the comments made by the prosecutor which are now assigned as error. However, as we stated in *State v. Jones,* 317 N.C. 487, 346

S.E. 2d 657 (1986), our appellate courts may, in the absence of an objection by the defendant, review a prosecutor's argument to determine whether the argument was so grossly improper that the trial court committed reversible error in failing to intervene *ex mero motu* to correct the error. A careful review of the comments in question, particularly in light of our previous decision in this case, leads to the inescapable conclusion that they were so grossly improper as to have necessitated intervention *ex mero motu* by the trial court and the failure to do so constituted prejudicial error requiring that the defendant be given a new sentencing hearing.

Initially, it is beyond dispute that the prosecutor's insinuations that Ms. Pierce was killed in order to prevent her from identifying the perpetrators of the robbery were improper. The prosecution presented *absolutely no evidence whatsoever* which showed that Ms. Pierce's killing was motivated by a desire to eliminate a potential witness. Furthermore, such a contention is not a reasonable inference from the facts which were introduced. In short, the prosecutor improperly argued facts and inferences which were not supported by the evidence.

Furthermore, we feel that the comments were "grossly" improper. This conclusion is based upon several considerations. First, this Court ordered a new sentencing hearing in *Williams I* based on a finding that the evidence failed to support the aggravating factor that the murder was committed to avoid or prevent a lawful arrest or to effectuate an escape from custody, which was submitted on the theory that Ms. Pierce was killed to prevent her from identifying defendant as one of the armed robbers. At the second sentencing hearing, the State presented virtually the same evidence with respect to the motive behind the murder. The prosecution did not request that this aggravating factor be submitted to the jury, and the trial court did not instruct the jury on this aggravating circumstance.

By virtue of our opinion in *Williams I*, coupled with events transpiring at the second sentencing hearing, the prosecutor was on clear notice that there was a complete lack of evidence that witness elimination was a motivating factor in Ms. Pierce's murder. The prosecutor, however, ignored all of these strong indications that there was no evidence to support the assertion that

Ms. Pierce was murdered in order to prevent her from identifying the robbers and proceeded to argue just such a contention to the jury. Also, it is important to note that the improper comments referred to one of the aggravating factors set out in N.C.G.S. § 15A-2000(e). To some degree, these aggravating factors may be thought of as conduct which is so blameworthy as to naturally provoke and justify the feeling that a defendant should receive a more severe sentence than would ordinarily be the case. Pointed and repeated references to aggravating factors not supported by the evidence would obviously have a strong tendency to prejudice the jury against a defendant. Since we found the improper submission of this aggravating factor to be reversible error in *Williams I*, we have no hesitation in concluding that the prosecution's argument repeatedly referring to this factor rose to the level of a gross impropriety. Finally, we note that the objectionable portion of the argument was not a single, isolated remark. On four separate occasions, the prosecutor insinuated that Ms. Pierce was murdered in order to prevent her from identifying the robbers.

For these reasons, we hold that the prosecutor's closing argument was so grossly improper that the trial court erred in failing to intervene *ex mero motu* to correct the error, as we cannot say that there is not a reasonable possibility that had the argument not been made, a different result would have been reached at trial. The defendant is therefore entitled to a new sentencing hearing.

Our holding on the jury argument issue makes it unnecessary to address the remaining assignments of error brought forward by the defendant. However, one other issue will no doubt recur at the new sentencing hearing and on any subsequent appeal therefrom. Conceding, without deciding, that the issue is not properly before this Court, in the interest of judicial economy and in an effort to provide as clear a body of law as possible in the area of capital sentencing, we elect to address this additional issue under our supervisory powers and under Rule 2 of the North Carolina Rules of Appellate Procedure.

[2] As stated previously, one of the aggravating factors submitted to and found by the jury was the aggravating circumstance set out in N.C.G.S. § 15A-2000(e)(6), that the murder was committed for pecuniary gain. As noted by the defendant, the only evi-

dence that the murder was committed for pecuniary gain was the evidence of the armed robbery, the underlying felony which supported the defendant's conviction for first-degree murder under the felony-murder rule. The defendant argues that the submission of the pecuniary gain aggravating factor was improper.

On several occasions, this Court has upheld the use of the pecuniary gain aggravating factor in felony-murder convictions. *E.g., State v. Oliver,* 309 N.C. 326, 307 S.E. 2d 304 (1983); *State v. Taylor,* 304 N.C. 249, 283 S.E. 2d 761 (1981), *cert. denied,* 463 U.S. 1213, 77 L.Ed. 2d 1398, *reh'g denied,* 463 U.S. 1249, 77 L.Ed. 2d 1456 (1983); *State v. Irwin,* 304 N.C. 93, 282 S.E. 2d 439 (1981); *State v. Oliver,* 302 N.C. 28, 274 S.E. 2d 183 (1981). In those cases, we held that submission of this aggravating circumstance in felony-murder cases did not violate an accused's fifth amendment right to be free from double jeopardy, rejecting the defendants' argument that the fact the felony was committed for pecuniary gain was an essential element of the felony murder. The defendant here, however, takes a different approach. He argues that where there is no evidence that the murder was committed for pecuniary gain other than that evidence necessary to support the first-degree murder convictions obtained under the robbery-felony-murder theory, use of the pecuniary gain aggravating factor violates the eighth amendment's proscription against cruel and unusual punishment.

In *Furman v. Georgia,* 408 U.S. 238, 33 L.Ed. 2d 346 (1972), the United States Supreme Court held that a death sentence will not be sustained where the sentencing procedure in question creates a substantial risk that the death penalty will be imposed in an arbitrary and capricious manner. This holding was reaffirmed four years later in *Gregg v. Georgia,* 428 U.S. 153, 49 L.Ed. 2d 859 (1976). At the same time, the Supreme Court has invalidated capital punishment schemes requiring the automatic imposition of the death penalty for specified offenses. *Woodson v. North Carolina,* 428 U.S. 280, 49 L.Ed. 2d 944 (1976). To pass constitutional muster, a capital punishment procedure must provide a meaningful basis for differentiating between the few cases in which the death penalty is appropriate and the many cases in which it is not. *Godfrey v. Georgia,* 446 U.S. 420, 64 L.Ed. 2d 398 (1980).

Most states, including North Carolina, have attempted to meet this constitutional requirement through the use of a sentenc-

ing procedure which requires the jury to consider specific aggravating and mitigating factors in order to arrive at a sentencing decision. However, in order to be constitutionally valid, an aggravating factor which would support the imposition of the death penalty must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens*, 462 U.S. 862, 877, 77 L.Ed. 2d 235, 249-50 (1983).

The defendant contends that because the pecuniary gain aggravating factor is automatically present in every felony-murder conviction in which the underlying felony is a robbery, the use of the aggravating factor in those cases does not distinguish those cases in which the death penalty is justified from those in which it is not. In support of this argument, the defendant cites the opinion of the United States Eighth Circuit Court of Appeals in *Collins v. Lockhart*, 754 F. 2d 258 (8th Cir.), *cert. denied*, --- U.S. ---, 88 L.Ed. 2d 475 (1985). There, the defendant was convicted in Arkansas of capital felony-murder, with robbery constituting the underlying felony. He was sentenced to death based in part upon a finding by the jury of the aggravating factor that the killing was committed for pecuniary gain. The court concluded that this violated the eighth amendment, stating:

> Every robber-murderer has acted for pecuniary gain. A jury which has found robbery murder cannot rationally avoid also finding pecuniary gain. Therefore, the pecuniary-gain aggravating circumstance cannot be a factor that distinguishes some robber-murderers from others. In effect, a robber-murderer enters the sentencing phase with a built-in aggravating circumstance. Since under Arkansas law and the Eighth Amendment as elaborated by the Supreme Court in *Godfrey v. Georgia, supra,* only one aggravating circumstance is required to impose the death penalty, the State has no need to show any additional aggravating circumstances at the sentencing phase. Thus, if no other aggravating or mitigating circumstances are found, the jury is left to decide whether to impose death on a robber-murderer without having made any finding that narrows the class of those who have committed this death-eligible crime.

*Id.* at 264 (footnote omitted). The defendant asks us to adopt the reasoning in *Collins* and hold that the submission of the pecuniary gain aggravating factor in felony-murder cases predicated on an underlying robbery violates the eighth amendment. Believing that *Collins* was erroneously decided, we decline this invitation.

In our view, the court in *Collins* was incorrect in believing that the eighth amendment requires that an aggravating factor must serve to narrow the class of "robber-murderers" to those few robber-murderers deserving of the death penalty. *See id.* (where the court stated: "Therefore, the pecuniary gain aggravating circumstance cannot be a factor that distinguishes some robber-murderers from others."). In *Zant*, the United States Supreme Court stated that an aggravating factor must work to distinguish between those deserving of the death penalty and "others found guilty of murder." *Zant v. Stephens*, 462 U.S. at 877, 77 L.Ed. 2d at 250. It is readily apparent from *Zant* that an aggravating factor will comport with the eighth amendment if it serves to narrow the *entire* class of first-degree murder cases to those in which the death penalty is justified. In North Carolina, the entire class of first-degree murderers includes any person who perpetrates a murder by means of poison, lying in wait, imprisonment, starving, torture, or by any other kind of willful, deliberate, and premeditated killing, or which is committed in the perpetration or attempted perpetration of any arson, rape, sex offense, robbery, kidnapping, burglary, or other felony committed or attempted with the use of a deadly weapon. N.C.G.S. § 14-17 (1981 and Cum. Supp. 1985). We perceive no constitutional requirement that the smaller sub-class of "robber-murderers" must be further narrowed. The fact that a killing is committed for pecuniary gain is a circumstance which legitimately serves to effectively differentiate between *all* persons convicted of first-degree murder and those few who are deserving of the death penalty. This is not, of course, to say that robber-murderers should be or could be automatically sentenced to death. Such a practice would run afoul of the dictates of *Woodson.* The jury must still engage in the finding and balancing of aggravating and mitigating factors before returning a death sentence. We merely hold that the fact that pecuniary gain may be considered as an aggravating circumstance in a robbery-murder case does not constitute a violation of the eighth amendment.

For the reasons stated herein, the verdict rendered in the sentencing hearing and the judgment of death imposed thereon are vacated, and the case is remanded to the Superior Court, Cabarrus County, for a new sentencing hearing.

Remanded for a new sentencing hearing.

Justice BILLINGS concurring in result.

When *Williams I* (*State v. Williams*, 304 N.C. 394, 284 S.E. 2d 437 (1981)) was decided by this Court, I was not a member of the Court and did not participate in the decision that the prosecution had "presented *absolutely no evidence whatsoever* which showed that Ms. Pierce's killing was motivated by a desire to eliminate a potential witness." 317 N.C. 474, 482, 346 S.E. 2d 405, 410. Because my review of the record on this appeal and of *Williams I*, unaided by oral argument, does not convince me that submission of the aggravating factor disapproved in *Williams I* was error, I concur only on the basis that the prior decision of this Court is the law of the case, binding upon the prosecution at the second sentencing hearing. Because the prosecutor clearly violated the mandate of this Court that the jury should not be allowed to consider as an aggravating factor that the victim was murdered in order to prevent her from identifying the robbers, I concur in the Court's conclusion that the trial judge erred to the defendant's prejudice in failing to intervene *ex mero motu*, and the defendant is entitled to a new sentencing hearing.

Justice MITCHELL joins in this concurring opinion.