STATE OF NORTH CAROLINA v. JEROME HAMLET, JR.

No. 228A83

(Filed 6 November 1984)

### 1. Homicide § 4— first degree murder defined

Murder in the first degree is the intentional and unlawful killing of a human being with malice and with premeditation and deliberation. G.S. 14-17.

### 2. Homicide § 4.3— premeditation and deliberation defined

Premeditation means that the act was thought out beforehand for some length of time, however short, but no particular amount of time is necessary for the mental process of premeditation. Deliberation means an intent to kill carried out by the defendant in a cool state of blood, in furtherance of a fixed design for revenge or to accomplish an unlawful purpose and not under the influence of a violent passion, suddenly aroused by lawful or just cause or legal provocation, and the phrase "cool state of blood" means that the defendant's anger or emotion must not have been such as to overcome defendant's reason.

### 3. Homicide § 18— proof of premeditation and deliberation

Among circumstances to be considered in determining whether a killing was with premeditation and deliberation are: (1) want of provocation on the part of the deceased; (2) the conduct and statements of the defendant before and after the killing; (3) threats and declarations of the defendant before and during the course of the occurrence giving rise to the death of the deceased; (4) ill will or previous difficulty between the parties; (5) the dealing of lethal blows after the deceased has been felled and rendered helpless; (6) evidence that the killing was done in a brutal manner; and (7) the nature and number of the victim's wounds.

**4. Criminal Law § 21.5— first degree murder—sufficient evidence of premeditation and deliberation**

    The State's evidence of premeditation and deliberation was sufficient to support conviction of defendant for first degree murder where it tended to show that a witness saw defendant holding a gun as the victim entered the vestibule of a club; during the course of the shooting, the defendant, upon hearing a question as to who fired the shots, replied that he did and asked whether anyone had anything to say about it; after making this statement, defendant reloaded his gun and continued the shooting; there was ill will between the parties because defendant and the victim had fought less than a week before the killing and the victim had been bragging about knocking defendant out; and the physical evidence showed that defendant fired a number of the shots into the victim after he had been felled and rendered unconscious.

**5. Criminal Law § 163— effect of failure to object to court's instructions**

    Where defendant failed to object to the trial court's final instructions to the jury, the defendant is deemed to have waived his right to assign error in the instructions and is entitled to relief only if he can show that the instructions complained of contained error amounting to "plain error." App. Rule 10(b)(2).

**6. Homicide § 25.2— instructions on premeditation**

    The trial court clearly instructed the jury that they were required to find that the intent to kill was formed before the victim was shot in order to find the existence of premeditation, and the instructions thus could not have caused the jury to believe it could convict if it found that premeditation occurred after the fatal shot was fired.

**7. Criminal Law § 165— failure to object to jury argument—appellate review**

    Where defendant failed to object to statements made by the prosecutor in his final argument at the guilt determination phase of the trial, appellate review must be limited to the question of whether the statements were so grossly improper that the trial judge should have corrected the argument *ex mero motu.*

**8. Criminal Law § 102.9— jury argument—defendant as "bad" man—supporting evidence**

    The evidence in a first degree murder case was sufficient to support jury arguments by the prosecutor that defendant "is the baddest on the block and everybody knows it" and that defendant killed the victim to regain his reputation as a "bad" man following an earlier attack by the victim on defendant.

**9. Criminal Law § 102.9— jury argument—credibility of defendant**

    The prosecutor's jury argument that defendant's testimony that he was shocked by the killing was not true and that this was a way of life with defendant was supported by evidence of defendant's prior criminal history and by testimony that, when asked who had shot the victim, defendant replied that he did and asked whether anyone had anything to say about it.

**10. Criminal Law § 102.9— jury argument—references to defendant as an "animal"**

The prosecutor's references to defendant in his jury argument as an "animal" and to his environment as a "jungle" were not so improper as to require action by the trial court *ex mero motu* given defendant's failure to object and defense counsel's similar statements referring to defendant's neighborhood as a "jungle" and to defendant and his peers as "bulls" and "leaders of the pack."

**11. Criminal Law § 102.12— jury argument—deterrent effect of death penalty**

Although the prosecutor improperly injected his personal viewpoint concerning the deterrent effect of the death penalty in his jury argument during the guilt phase of a first degree murder trial, such argument was not so grossly improper as to require action by the trial court *ex mero motu.*

**12. Constitutional Law § 62; Criminal Law § 135.3— first degree murder—death qualification of jurors**

Death qualifying the jury before the guilt phase of a first degree murder trial did not result in a jury biased in favor of the prosecution on the issue of guilt and deprive defendant of a fair trial.

**13. Criminal Law § 135.8— especially heinous, atrocious, or cruel aggravating circumstance**

A finding that the especially heinous, atrocious, or cruel aggravating circumstance exists in a first degree murder case is permissible only when the level of brutality involved exceeds that normally found in first degree murder or when the first degree murder in question was conscienceless, pitiless, or unnecessarily torturous to the victim. G.S. 15A-2000(e)(9).

**14. Criminal Law § 135.8— first degree murder—especially heinous, atrocious, or cruel aggravating circumstance—insufficient evidence**

The evidence in a first degree murder case was insufficient to support submission to the jury of the especially heinous, atrocious, or cruel aggravating circumstance where it showed that the victim was unaware of defendant's presence until the victim entered the vestibule of a club where he was shot immediately, and that the victim was rendered unconscious by the first shot that struck him and thereafter was completely unaware of additional shots fired by defendant and suffered no pain.

Justice MARTIN dissenting in part.

Justices COPELAND and MEYER join in this dissenting opinion.

APPEAL from judgment and sentence of death entered by *Judge Franklin R. Brown* at the April 25, 1983 Criminal Session of Superior Court, NEW HANOVER County.

The defendant was charged in a bill of indictment, proper in form, with the murder of Asa Earl Bramlett. The jury found the defendant guilty of murder in the first degree and recommended

that he be sentenced to death. Based upon the jury recommendation, the trial court entered judgment sentencing the defendant to death. The defendant appealed to the Supreme Court as a matter of right under N.C.G.S. 7A-27(a). Heard in the Supreme Court September 11, 1984.

*Rufus L. Edmisten, Attorney General, by Ralf F. Haskell, Special Deputy Attorney General, for the State.*

*Adam Stein, Appellate Defender, by Malcolm Ray Hunter, Jr., Assistant Appellate Defender, for the defendant appellant.*

MITCHELL, Justice.

The defendant brings forward assignments of error relating to the guilt-innocence determination phase and to the sentencing phase of his trial. We find no prejudicial error in the guilt-innocence determination phase of the defendant's trial. After a careful review of the facts and our prior decisions, we hold, however, that the jury should not have been permitted to consider whether the murder was "especially heinous, atrocious, or cruel," under N.C.G.S. 15A-2000(e)(9). Since this was the only aggravating circumstance found by the jury, we vacate the sentence of death and impose a life sentence.

The evidence presented by the State during the guilt-innocence determination phase of the trial tended to show that about 1:45 a.m. on February 12, 1983, the defendant, Jerome Hamlet, Jr., entered the vestibule at the Club Ebony in Wilmington. He was recognized and greeted by Sheila Mallette, an employee of the club. A few moments later Asa Bramlett walked into the vestibule from the lobby of the club. Sheila Mallette was standing at the door between the lobby and the vestibule and saw a gun in the defendant's hand. He shot once but did not hit anyone. His second shot struck Bramlett in the head. Sheila Mallette then ran out of the club. A number of shots were heard coming from the vestibule.

Etta Allen, the owner of the Club Ebony, was told by Mallette that Asa Bramlett had been shot. Allen asked who did it and a voice from the vestibule replied, "I did. Does anyone have anything to say about it?" More shots were then fired in the vestibule. Sheila Mallette circled around to the front of the club

and saw the defendant reloading a pistol at the outside door of the club. She then saw him reenter the vestibule and more shots rang out. The defendant then fled the scene firing shots in the air as he ran.

The police and rescue squad were called to the scene. When the rescue squad arrived the victim Bramlett was alive but unconscious. He was transported to New Hanover Memorial Hospital. When his clothing was removed, a three-inch hawkbill knife was discovered in one of his pockets.

Dr. Robert Moore, a neurosurgeon, performed surgery on Bramlett. He found that Bramlett had a bullet wound to the head that went from above the right ear through the head and brain. Bramlett died on the operating table at approximately 7:10 a.m. February 12, 1984. He never regained consciousness.

Dr. Walter Gable, an Onslow County medical examiner, performed an autopsy on the body of the victim. During the course of the autopsy he discovered a bullet wound to the brain, six other bullets in the torso of the victim, and five bullet exit wounds in the back of the body. Dr. Gable testified that in his opinion the bullet wound to the head caused Bramlett's death and that it rendered him unconscious and unable to feel any pain.

As a result of information given them by the defendant, the police contacted a friend of the defendant who turned over a .32 caliber revolver to them. Robert Cerwin, an S.B.I. firearms expert, testified that though he could not positively match the bullets found in the victim to the gun obtained by the police, ten discharged shells discovered in the vestibule did come from the weapon.

The defendant took the stand and testified that he had known the victim for approximately two years and that they had used and dealt drugs together. The defendant said he knew a number of people, including one D.D. Johnson, who had been attacked by Bramlett. Five days prior to the shooting the defendant and Bramlett had argued over drugs, and Bramlett had attacked the defendant with a pipe rendering him unconscious for half an hour. The defendant began carrying a gun following the altercation.

On the day of the shooting the defendant had used heroin and cocaine and had been drinking wine. However, at the time of the shooting he was thinking clearly. The defendant stated that he did not go to the Club Ebony with the intent to kill Bramlett and was surprised to see him there. The defendant testified that soon after he entered the vestibule, Bramlett came toward him with a "vicious look on his face" while reaching for his pocket. The defendant was afraid of the victim Bramlett and fired one shot over his head in an attempt to scare him off. When this failed to halt the victim's advance, the defendant Hamlet shot him. The defendant testified that he did not recall what happened after the first shot struck Bramlett and he didn't remember how many times he had shot the victim. Following his arrest, the defendant gave a statement to the police in which he admitted shooting Bramlett. He also told the police where the gun was located.

Alexander Wilder testified for the defendant and stated that he had been present when Bramlett had attacked the defendant Hamlet five days before the shooting. Donald Johnson testified that he had previously been assaulted by Bramlett as the defendant had testified.

At the conclusion of the guilt-innocence determination phase of the trial, the jury returned a verdict finding the defendant guilty of murder in the first degree. The trial court then convened a sentencing hearing to determine the sentence to be imposed. The State indicated that it would rely upon the evidence presented at the guilt-innocence determination phase of the trial to support the aggravating circumstance that the murder was especially heinous, atrocious, or cruel. The State presented no additional evidence at the sentencing hearing.

The defendant offered the testimony of his father who stated that the defendant is a loving son and was the product of a broken home. The father also stated that he knew the defendant used drugs. The defendant testified that he was sorry he had killed Bramlett and expressed sympathy for Bramlett's family. No further evidence was presented at the sentencing hearing on behalf of the defendant.

Based upon the evidence introduced during the sentencing phase of the trial, the trial court instructed the jury on one possi-

ble aggravating circumstance and six possible mitigating cir-
cumstances. The possible aggravating circumstance the jury was
permitted to consider was whether the murder was especially
heinous, atrocious, or cruel. The jury was instructed that they
need not specify which particular mitigating circumstances they
found, if they found any of the mitigating circumstances to exist.

The written issues put to the jury concerning aggravating
and mitigating circumstances and the jury's answers thereto were
as follows:

### ISSUES

Issue One:

Do you unanimously find from the evidence, beyond a
reasonable doubt, that the following aggravating circum-
stance existed at the time of the commission of this murder?

Was this murder especially heinous, atrocious, or cruel?

Answer: Yes.

Issue Two:

Do you unanimously find beyond a reasonable doubt that
the aggravating circumstance found by you is sufficiently
substantial to call for the imposition of the death penalty?

Answer: Yes.

Issue Three:

Do you find one or more mitigating circumstances?

Answer: Yes.

Issue Four:

Do you unanimously find beyond a reasonable doubt that
the aggravating circumstance outweigh the mitigating cir-
cumstances?

Answer: Yes.

Based upon their answers to these issues, the jury recommended
the death sentence. Following the recommendation the trial court

entered judgment sentencing the defendant to death. The defendant appealed.

## I.

## Guilt-Innocence Determination Phase

The defendant has brought forward several assignments of error and supporting contentions concerning the guilt-innocence determination phase of the trial.

At the close of the State's evidence and at the close of all evidence the defendant moved to dismiss the charge of first degree murder. The motions were denied. The defendant contends that it was error for the trial court to submit the charge of first degree murder based on premeditation and deliberation for the jury's consideration. The defendant argues that there was no substantial evidence to support a reasonable inference of premeditation and deliberation.

Before the issue of a defendant's guilt may be submitted to the jury, the trial court must be satisfied that substantial evidence has been introduced tending to prove each essential element of the offense charged and that the defendant was the perpetrator. *State v. Powell*, 299 N.C. 95, 261 S.E. 2d 114 (1980). Substantial evidence must be existing and real but need not exclude every reasonable hypothesis of innocence. *State v. Williams*, 308 N.C. 47, 301 S.E. 2d 335, *cert. denied*, --- U.S. ---, 78 L.Ed. 2d 177 (1983). In considering a motion to dismiss, the trial court must examine the evidence in the light most favorable to the State, and the State is entitled to every reasonable intendment and inference to be drawn therefrom. *State v. Bright*, 301 N.C. 243, 271 S.E. 2d 368 (1980). Contradictions and discrepancies are for the jury to resolve and do not warrant dismissal. *State v. Powell*, 299 N.C. 95, 261 S.E. 2d 114 (1980).

[1, 2] Murder in the first degree is the intentional and unlawful killing of a human being with malice and with premeditation and deliberation. N.C.G.S. 14-17; *State v. Fleming*, 296 N.C. 559, 251 S.E. 2d 430 (1979). Premeditation means that the act was thought out beforehand for some length of time, however short, but no particular amount of time is necessary for the mental process of premeditation. *State v. Britt*, 285 N.C. 256, 204 S.E. 2d 817 (1974).

Deliberation means an intent to kill carried out by the defendant in a cool state of blood, in furtherance of a fixed design for revenge or to accomplish an unlawful purpose and not under the influence of a violent passion, suddenly aroused by lawful or just cause or legal provocation. *State v. Bush*, 307 N.C. 152, 297 S.E. 2d 563 (1982). The phrase "cool state of blood" means that the defendant's anger or emotion must not have been such as to overcome the defendant's reason. *State v. Myers*, 299 N.C. 671, 263 S.E. 2d 768 (1980).

[3] Premeditation and deliberation relate to mental processes and ordinarily are not readily susceptible to proof by direct evidence. Instead they usually must be proved by circumstantial evidence. *State v. Buchanan*, 287 N.C. 408, 215 S.E. 2d 80 (1975). Among other circumstances to be considered in determining whether a killing was with premeditation and deliberation are: (1) want of provocation on the part of the deceased; (2) the conduct and statements of the defendant before and after the killing; (3) threats and declarations of the defendant before and during the course of the occurrence giving rise to the death of the deceased; (4) ill will or previous difficulty between the parties; (5) the dealing of lethal blows after the deceased has been felled and rendered helpless; and (6) evidence that the killing was done in a brutal manner. *State v. Williams*, 308 N.C. 47, 301 S.E. 2d 335, *cert. denied*, --- U.S. ---, 78 L.Ed. 2d 177 (1983). We have also held that the nature and number of the victim's wounds is a circumstance from which premeditation and deliberation can be inferred. *State v. Brown*, 306 N.C. 151, 293 S.E. 2d 569, *cert. denied*, 459 U.S. 1080 (1982).

[4] We conclude in the present case that there was substantial evidence that the killing was premeditated and deliberate and that it was not error to submit to the jury the question of the defendant's guilt on the first degree murder charge. Sheila Mallette testified that she saw the defendant holding a gun as the victim entered the vestibule. This would tend to rebut the defendant's claim of self-defense and raises an inference that there was no provocation by the deceased. During the course of the shooting, the defendant, upon hearing a question as to who fired the shots, replied "I did. Does anyone have anything to say about it?" After making this statement, he reloaded the gun and continued the shooting. This conduct and statement by the defendant during

the course of the event supports a reasonable inference that the defendant was acting in a cool state of blood and in furtherance of a fixed design to kill the victim by a previously planned attack.

There was also evidence that the defendant and the deceased had fought less than a week before the killing and that the victim had been bragging about knocking the defendant out. This tended to show ill will between the parties. Further, the physical evidence tended to show that the defendant fired a number of shots into the victim after he had been felled and rendered unconscious. In light of such evidence, we hold that there was sufficient evidence of premeditation and deliberation to support the defendant's conviction for first degree murder.

The defendant next contends that the trial court's instructions coupled with the prosecutor's argument led the jury to believe that the defendant could be convicted of first degree murder if the premeditation occurred after he fired the fatal shot. This contention is without merit.

[5] The defendant failed to object to the trial court's final instructions to the jury. Therefore, under Rule 10(b)(2), Rules of Appellate Procedure, the defendant is deemed to have waived his right to assign error in the instructions. In such cases the defendant is entitled to relief only if he can show that the instructions complained of contained error amounting to "plain error" as that term is defined in *State v. Odom*, 307 N.C. 655, 300 S.E. 2d 375 (1983). No such error appears in the present case.

[6] In its instructions to the jury on the elements of first degree murder, the trial court specifically stated that the State must prove:

> Fourth, that the defendant acted with premeditation. That is, that he formed the intent to kill Asa Earl Bramlett, Jr., over some period of time, however short, *before he shot Asa Earl Bramlett, Jr.*

(Emphasis added.) There was no error in this instruction. The trial court clearly instructed the jury that they were required to find that the intent to kill was formed *before the victim was shot* in order to find the existence of premeditation. We hold that the quoted instruction cured any suggestion to the contrary in the

prosecutor's argument to the jury. The trial court's instructions could not have caused the jury to believe it could convict if it found that premeditation occurred after the fatal shot was fired. Therefore, it is clear that the instruction did not involve "plain error" as that term is defined in *Odom*.

[7] The defendant next argues that the prosecutor made certain prejudicial statements during his final argument at the guilt-innocence determination phase which require a new trial. Initially, we note that the defendant failed to object to these statements. Therefore, our review must be limited to the question of whether the statements were so grossly improper that the trial judge should have corrected the argument *ex mero motu. State v. Craig*, 308 N.C. 446, 302 S.E. 2d 740, *cert. denied*, --- U.S. ---, 78 L.Ed. 2d 247 (1983).

In hotly contested cases counsel will be given wide latitude in arguments to the jury and are permitted to argue the facts which have been presented as well as all reasonable inferences which can be drawn from them. *State v. Lynch*, 300 N.C. 534, 268 S.E. 2d 161 (1980). Counsel, however, may not raise incompetent and prejudicial matters nor refer to facts and personal opinions not in evidence. *Id.*

[8] The defendant argues that the trial court erred in permitting the prosecutor to argue that "the [defendant] is the baddest on the block and everybody knows it." The defendant also says it was error to allow argument that he killed Bramlett to regain his reputation as a "bad" man following the earlier attack by Bramlett. The defendant contends that there was no evidence to support these arguments. We disagree.

We first note that the defendant admitted to having committed a number of crimes including assault with a deadly weapon with intent to kill, carrying a dangerous weapon, assault on a female, and various drug offenses. He also admitted to shooting his father-in-law. There is evidence that at least one acquaintance of the defendant saw him attacked by Bramlett. The defendant testified that prior to the shooting the deceased had bragged about knocking him out. The evidence supports a reasonable inference that the defendant was known in the community as a man prone to violence and that his aggressive reputation had been weakened in the eyes of the community as a result of the pre-

vious fight with Bramlett. Defense counsel appeared to acknowledge the importance to the defendant of such a reputation when in closing argument he stated that the atmosphere of the defendant's environment is one where Hamlet and his peers "prance around . . . spouting off who is the best, who is the meanest, who is the low downest." The evidence presented supported a reasonable inference that the defendant committed the murder in order to redeem his reputation as a violent man. The prosecutor's statements in this regard were not improper.

[9] The next argument complained of related to the defendant's testimony that he was shocked by the killing. The prosecutor stated, "Bull, Bull. It is not true at all. Not true at all. This is a way of life with Jerome Hamlet, a way of life." The defendant contends that there was no evidence to support this claim. While there was no evidence that the defendant had ever killed anyone, his prior criminal history supported an inference that the defendant was a violent man with criminal tendencies who would not be shocked or dismayed by this killing. Furthermore, when asked who had shot Bramlett, the defendant replied, "I did. Does anyone have anything to say about it?" This statement lent additional support to an inference that the defendant was in control of his emotions and not shocked by the killing. The defendant's argument on this point is without merit.

[10] The defendant next contends references by the prosecutor to the defendant as an "animal" and to his environment as a "jungle" were so prejudicial as to warrant a new trial. We do not agree. During his closing argument the defense counsel himself referred to the defendant's neighborhood as a "jungle" and to the defendant and his peers as "bulls" and "leaders of the pack." We do not condone comparisons of criminal defendants to members of the animal kingdom. See State v. Smith, 279 N.C. 163, 181 S.E. 2d 458 (1971). However, reference by the prosecutor to the defendant as an "animal" was not so improper as to require action by the trial court ex mero motu given the defendant's failure to object and defense counsel's similar statements.

[11] The defendant also claims that it was improper for the prosecutor to argue that convicting the defendant of first degree murder and executing him would deter other crime in the community. During his closing argument the prosecutor stated:

I don't know when the killing will stop. I have represented people who have done gross acts and I have appeared with the State as prosecutor and prosecuted people who have murdered people before January the 1st, and I do not know when it will stop. It probably will, but as long as these people are allowed to operate within society with almost total immunity insofar as the ultimate punishment it will continue. If unabated it will not only continue, it will get worse . . . .

We have held in a number of cases that it is permissible for a prosecutor to ask the jury to return the highest degree of conviction and the most severe punishment available for the offense charged. *See State v. Johnson*, 298 N.C. 355, 259 S.E. 2d 752 (1979); *State v. Christopher*, 258 N.C. 249, 128 S.E. 2d 667 (1962). Here, however, during the guilt-innocence determination phase of the trial, the prosecutor injected his personal viewpoint concerning the deterrent effect of the death penalty. We have held that such statements are improper. *State v. Kirkley*, 308 N.C. 196, 302 S.E. 2d 144 (1983). Though the statement was improper it was not objected to, and we hold that it was not so grossly improper as to require action by the trial court *ex mero motu. See id.*

[12]   The defendant next contends that the practice of "death qualifying" the jury before the guilt-innocence phase of his trial resulted in a jury biased in favor of the prosecution on the issue of guilt and deprived him of a fair trial. We have repeatedly rejected such arguments. *E.g., State v. Murray*, 310 N.C. 541, 313 S.E. 2d 523 (1984). This assignment of error is without merit.

## II.

### Sentencing Phase

The defendant presents numerous assignments of error relative to the sentencing phase of his trial. The dispositive assignment of error, however, concerns the submission for consideration by the jury of the aggravating circumstance that the killing "was especially heinous, atrocious, or cruel." N.C.G.S. 15A-2000(e)(9). The defendant contends that the evidence did not support the existence of this aggravating circumstance, which was the only aggravating circumstance submitted to the jury and found to exist.

[13]   In deciding whether this aggravating circumstance was properly submitted to the jury, we must first take note of certain

established principles. Though every murder is heinous, atrocious, and cruel, the legislature made it clear that it did not intend for this aggravating circumstance to apply in every first degree murder case. Instead, the legislature specifically provided that this aggravating circumstance may be found only in cases in which the first degree murder committed was *especially* heinous, *especially* atrocious, or *especially* cruel. N.C.G.S. 15A-2000(e)(9). Therefore, a finding that this aggravating circumstance exists is only permissible when the level of brutality involved exceeds that normally found in first degree murder or when the first degree murder in question was conscienceless, pitiless, or unnecessarily torturous to the victim. *State v. Goodman*, 298 N.C. 1, 257 S.E. 2d 569 (1979).

In *State v. Oliver*, 309 N.C. 326, 307 S.E. 2d 304 (1983), we identified two types of murder as included in the category of murders which would warrant the submission of the especially heinous, atrocious, or cruel aggravating circumstance to the jury. One type involved killings which are physically agonizing for the victim or which were in some other way dehumanizing. The other type consists of those killings which are less violent, but involve infliction of psychological torture by leaving the victim in his last moments aware of but helpless to prevent impending death.

The State contends that there was sufficient evidence to allow the jury to find that: (1) the victim suffered a violent and torturous death at the hands of the defendant; and (2) he suffered psychological torture as a result of the "ambush" slaying. Therefore, the State argues that the murder falls into either or both of the categories set out in *Oliver*. We do not agree.

[14] In determining whether the evidence is sufficient to support a finding of essential facts which would support a determination that a murder was "especially heinous, atrocious, or cruel" the evidence must be considered in the light most favorable to the State, and the State is entitled to every reasonable inference to be drawn therefrom. *State v. Stanley*, 310 N.C. 332, 312 S.E. 2d 393 (1984). *See State v. Cutler*, 271 N.C. 379, 156 S.E. 2d 679 (1967). Under such an analysis, the evidence in the present case was insufficient to support the submission of the aggravating factor to the jury. The evidence showed that the defendant fired almost immediately upon the victim entering the vestibule. The

first shot to strike Bramlett hit him in the head. Dr. Gable, the Medical Examiner, testified that the victim had only one bullet wound to the head, and that in his opinion this wound caused the victim's death. The victim was unconscious and unable to feel any pain after the shot to his head. He died approximately five hours after the shooting without regaining consciousness. Though death was not instantaneous, the victim did not linger for any extended period of time following the shooting. *See State v. Hamlette*, 302 N.C. 490, 276 S.E. 2d 338 (1981). Further, there was no evidence that the victim suffered an unusually torturous death as a result of the multiple gunshot wounds. In fact the State's own uncontradicted evidence showed that the victim was rendered unconscious by the first shot that struck him and thereafter was completely unaware of the additional shots and suffered no pain.

The State also contends that there was evidence to support an inference that the victim suffered psychological torture prior to the killing. We disagree. The evidence in the present case tended to show that the victim was unaware of the assailant's presence until the victim entered the vestibule where he was shot immediately. There was no evidence upon which to base an inference that Bramlett was left "in his last moments as a sentient being, aware but helpless to prevent impending death." *State v. Oliver*, 309 N.C. 326, 346, 307 S.E. 2d 304, 318 (1983).

Two cases, one decided by the Supreme Court of the United States and the other decided by this Court, control the present case. Each requires a holding that the trial court erred in permitting the jury to find in the present case that the murder was especially heinous, atrocious, or cruel.

In *Godfrey v. Georgia*, 446 U.S. 420 (1980), the defendant went to the home of his mother-in-law where his wife and eleven year old daughter were staying. He peered through the window and observed his wife, mother-in-law and daughter playing a card game. He pointed a shotgun through a window and shot his wife in the forehead killing her instantly. He immediately entered the home and struck and injured his fleeing daughter with the barrel of the shotgun. He then shot his mother-in-law in the head killing her instantly. The jury found as an aggravating factor that the murder "was outrageously or wantonly vile, horrible and inhuman." The Supreme Court of Georgia affirmed the death sen-

tence holding that the verdict was "factually substantiated." The Supreme Court of the United States held that the Supreme Court of Georgia had unconstitutionally construed the aggravating factor. The Supreme Court of the United States specifically stated that:

> There is no principled way to distinguish this case, in which the death penalty was imposed, from the many cases in which it was not. Accordingly, the judgment of the Georgia Supreme Court insofar as it leaves standing the petitioner's death sentences is reversed, and the case is remanded to that court for further proceedings.

*Id.* at 433. The *Godfrey* decision compels a similar holding in the present case. *See Eddings v. Oklahoma,* 455 U.S. 104, 109, n. 4 (1982) (application of Oklahoma "heinous, atrocious or cruel" aggravating circumstance most likely violated *Godfrey*).

In *State v. Stanley,* 310 N.C. 332, 312 S.E. 2d 393 (1984), the defendant stopped his wife on the street in the presence of other family members. Upon seeing the defendant with a gun, the wife said "Please, Stan." The defendant then shot her nine times. Although she ultimately died from the wounds inflicted by the defendant, she remained conscious throughout the entire attack. This Court, relying in large measure upon the holding of the Supreme Court of the United States in *Godfrey,* held that the trial court erred in permitting the jury to find as an aggravating circumstance that the murder was especially heinous, atrocious, or cruel.

The murder in the present case was certainly a vicious and pitiless crime. The holdings of *Godfrey* and *Stanley* compel the conclusion, however, that the trial court erred in permitting the jury to find as an aggravating circumstance that the murder was *especially* heinous, atrocious, or cruel. Since this was the only aggravating circumstance submitted or found, this Court must vacate the sentence of death and impose a sentence of life imprisonment. N.C.G.S. 15A-2000(d)(2).

The death sentence is vacated and the defendant is hereby sentenced to imprisonment in the State's prison for the remainder of his natural life. The defendant is entitled to credit for days spent in confinement prior to the date of this judgment. The

Clerk of the Superior Court, New Hanover County, shall issue a commitment accordingly.

Guilt-Innocence Determination Phase: No error.

Sentencing Phase: Death sentence vacated and sentence of life imprisonment imposed.

Justice MARTIN dissenting in part.

I cannot find as a matter of law that the evidence in this case is insufficient to submit the issue of whether the killing was especially heinous, atrocious, or cruel to the jury. Therefore, I must dissent from the majority's holding with respect to this issue. I concur in the majority's opinion with respect to the guilt or innocence phase of the trial.

The question before us is whether, as a matter of law, there is sufficient evidence to submit the issue to the jury for its determination. In making this decision, we must view the evidence in the light most favorable to the state, discrepancies and contradictions are disregarded, the state's evidence is taken as true, and the state is entitled to every inference of fact that may be reasonably deduced therefrom. *State v. Lester*, 294 N.C. 220, 240 S.E. 2d 391 (1978); *State v. Witherspoon*, 293 N.C. 321, 237 S.E. 2d 822 (1977). The defendant's evidence, unless favorable to the state, is not to be considered in deciding the question. *State v. Earnhardt*, 307 N.C. 62, 296 S.E. 2d 649 (1982). If there is substantial evidence of each element of the issue under consideration, the issue must be submitted to the jury for its determination. *State v. Roseman*, 279 N.C. 573, 184 S.E. 2d 289 (1971). If the evidence only raises a suspicion or conjecture as to the existence of the fact to be found, the issue should not be submitted. *State v. Cutler*, 271 N.C. 379, 156 S.E. 2d 679 (1967).

Chief Justice Stacy stated the applicable rule as follows:

[I]f there be any evidence tending to prove the fact in issue, or which reasonably conduces to its conclusion as a fairly logical and legitimate deduction, and not merely such as raises a suspicion or conjecture in regard to it, the case should be submitted to the jury.

*State v. Johnson*, 199 N.C. 429, 431, 154 S.E. 730, 731 (1930).

*State v. Stanley*, 310 N.C. 332, 347, 312 S.E. 2d 393, 401-02 (1984) (Martin, J., dissenting).

The majority relies to a large extent upon the theory that the first shot to strike Bramlett rendered him unconscious and he did not suffer any pain from the infliction of the additional six bullet wounds. This theory is based upon the following testimony of Dr. Gable:

> Q. Dr. Gable, in your medical expert opinion, if in fact the gunshot wound to the head was the first shot that hit the victim Asa Bramlett, would he have been rendered unconscious and not feeling any pain thereafter?
>
> A. In my opinion he probably would have been rendered unconscious, yes, sir.
>
> Q. And that would mean he wouldn't feel any pain?
>
> A. Yes, sir.

The majority jumps from this testimony to the conclusion that "it *rendered* him unconscious and unable to feel any pain." "The victim *was* unconscious and unable to feel any pain after the shot to his head." (Emphases ours.)

Dr. Gable's testimony just does not support the majority's conclusion. The jury could infer that the shot rendered Bramlett unconscious or it could decline to do so. The point is that it was a question for the jury to decide, not the court. The doctor said all that he could, that in his opinion the shot to the head *probably* rendered the victim unconscious. Whether it did was a question of fact for the jury.

The evidence discloses an appreciable interval of time between the first shot, which missed Bramlett, and the next shot that struck him in the head. Etta Allen testified:

> Q. After you heard that shot what did you hear or see?
>
> A. Well, after the first shot I didn't hear anything for awhile.

Q. For awhile? What do you mean? What do you mean, "For a while."

A. Well, moments passed before I heard anything else.

Q. What did you hear after moments passed?

A. I heard another—other shots.

From this testimony, the jury could reasonably infer that Bramlett endured psychological torture during those moments as he faced defendant's pistol, awaiting the next shot. *State v. Oliver*, 309 N.C. 326, 307 S.E. 2d 304 (1983). Likewise, as in *Oliver*, it is significant that after the witness Etta Allen inquired "Who did it?" the defendant replied "I did. Does anyone have anything to say about it?" Defendant then reloaded his revolver and fired more bullets into Bramlett, lying prostrate on the floor.

This statement and the additional wounding of Bramlett as he lay helpless indicates a conscienceless and pitiless murder with excessive brutality. *State v. Stanley*, 310 N.C. 332, 312 S.E. 2d 393. The majority concedes that this murder was "certainly a vicious and pitiless crime."

The correct standard to be applied in determining whether the evidence is sufficient to be submitted to the jury on this issue is expressed in

> *State v. Pinch*, 306 N.C. 1, 292 S.E. 2d 203, *cert. denied*, 74 L.Ed. 2d 622 (1982). The aggravating circumstance " 'does not arise in cases in which death was immediate and in which there was no unusual infliction of suffering upon the victim.' " *Id.* at 34, 292 S.E. 2d at 228 (citation omitted). It is appropriate only when there is evidence of "excessive brutality, beyond that normally present in any killing, or when the facts as a whole portray the commission of a crime which was conscienceless, pitiless or unnecessarily torturous to the victim." *Id. See State v. Rook*, 304 N.C. 201, 283 S.E. 2d 732 (1981), *cert. denied*, 455 U.S. 1038 (1982); *State v. Goodman*, 298 N.C. 1, 257 S.E. 2d 569 (1979).

*State v. Stanley*, 310 N.C. at 350-51, 312 S.E. 2d at 403 (Martin, J., dissenting).

It is true that not every murder is especially heinous, atrocious, or cruel. However, I find the evidence here sufficient to submit the issue to the jury for its determination within the guidelines of *Godfrey v. Georgia*, 446 U.S. 420, 64 L.Ed. 2d 398 (1980), and the decisions of this Court. The evidence is sufficient for the jury to find that the killing was excessively brutal, beyond that normally present in a killing, and that it was conscienceless, pitiless, or unnecessarily torturous to Asa Bramlett and therefore especially heinous, atrocious, or cruel. *State v. Pinch*, 306 N.C. 1, 292 S.E. 2d 203, *cert. denied*, 459 U.S. 1056 (1982). The jury under proper instructions remains free to reject or find the circumstance. *State v. Cherry*, 298 N.C. 86, 257 S.E. 2d 551 (1979), *cert. denied*, 446 U.S. 941 (1980). Certainly, in resolving the question of law as to whether this aggravating circumstance should be submitted to the jury, it is not our province to consider how the jury should have answered the issue. That is the proper function of the jury under proper instructions from the trial court. The evidence supporting the jury's finding that the murder was especially heinous, atrocious, or cruel goes far beyond mere speculation or conjecture and the issue was properly submitted to the jury. My vote is to find no error in the sentencing phase of the trial, and the Court should then conduct its proportionality review. N.C. Gen. Stat. § 15A-2000(d)(2) (1977).

Justices COPELAND and MEYER join in this dissenting opinion.